UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ X
BERNARD H. GLATZER,                  :
                                     :
                Plaintiff,           :  09 Civ. 0650
                                     :
        - against -                  :  **DECISION AND ORDER**
                                     :
HON. JOHN A. BARONE, HON. LARRY S.   :
SCHACHNER, and HON. JONATHAN LIPPMAN,:
                                     :
                Defendants.          :
------------------------------------X
**VICTOR MARRERO, United States District Judge.**

Pro se plaintiff Bernard H. Glatzer ("Glatzer")[1] brought this action pursuant to 42 U.S.C. § 1983 ("§ 1983") seeking permanent injunctive relief directing defendants to hear and adjudicate certain actions pending before them in New York State courts. Defendants are Justice John A. Barone ("Barone") and Justice Larry S. Schachner ("Schachner") of the Supreme Court of the State of New York, Bronx County, and Jonathan Lippman ("Lippman"), then Presiding Justice of the New York State Supreme Court, Appellate Division, First Department (collectively "Defendants"). Defendants move to

---

[1] Although Glatzer filed this action pro se, he describes himself as "an inactive member of the State Bar of Texas." Affidavit of Bernard H. Glatzer in Support of Application for Certificate of Default, dated February 20, 2009, at 1. The Court takes Glatzer's status as an attorney and former member of a state bar into account in considering the degree of litigational latitude that should be accorded him as a pro se plaintiff. See, e.g., Harbulak v. Suffolk County, 654 F.2d 194, 198 (2d Cir. 1981) (because plaintiff was a practicing lawyer, "he cannot claim the special consideration which the courts customarily grant to pro se parties"); Taylor v. Alvarez, 07-23003 CIV., 2008 WL 1840719, at *1 n.2 (S.D. Fla. Apr. 21, 2008) (observing that plaintiff was non-practicing attorney and recognizing "that attorneys proceeding pro se on their own behalf are generally given less leniency than non-attorney pro se litigants").

dismiss the action, challenging this Court's subject matter jurisdiction under the <u>Rooker-Feldman</u> doctrine, <u>see</u> <u>Rooker v. Fidelity Trust Co.</u>, 263 U.S. 413 (1923); <u>District of Columbia Court of Appeals v. Feldman</u>, 460 U.S. 462 (1983), as well as urging abstention under <u>Younger v. Harris</u>, 401 U.S. 37 (1971). By Order dated March 30, 2009, the Court granted the Defendants' motion and dismissed the complaint. On that occasion the Court indicated that it would state its findings, reasoning, and conclusions in a subsequent Decision and Order. Accordingly, for the reasons stated below, Defendants' motion is GRANTED. Because the Court views this action as presenting such a clear and compelling case for its abstention from exercising jurisdiction, it would refrain from doing so on its own motion even if Defendants' motion were not before it. <u>See Bellotti v. Baird</u>, 428 U.S. 132, 143 n.10 (1976) (district court may raise abstention <u>sua</u> <u>sponte</u>).

## I.  BACKGROUND

This case is about a bad idea. Glatzer asks this Court to issue injunctions to compel state trial judges who dismissed two of his lawsuits to hear and adjudicate his actions again, as well as to restrain a state appellate court from undertaking further proceedings in connection with Glatzer's litigation. Since 1793, in accordance with a general principle decreed by congressional legislation and

Supreme Court decisions for the preservation of this country's
dual system of government, federal courts have been instructed
not to grant injunctive relief to interfere with state
judicial functions, with rare exceptions justified only in the
most extraordinary exigencies.  Still, despite this sound,
longstanding constraint on federal judicial power, litigants,
ever a hopeful, undaunted and creative lot, persist in testing
the strength and outer limits of the policy.  If nothing else,
experience demonstrates that bad ideas, like weeds, are
tenacious and resilient, endowed with an uncanny trait that,
as if organic, enables them to find new fertile and receptive
minds in which to take root.  For courts entrusted to protect
the constitution of the organic whole, this challenge recalls
Voltaire's counsel for us all to eradicate "l'infâme," and
cultivate our garden, so as to weed out potential enduring
menaces.  The first step in this task is to recognize any
noxious notion for what it is, a bad idea, a species of
unwanted growth.

Glatzer filed this action in this Court on January 22,
2009 and had served all three Defendants by January 28, 2009.
Because Defendants had not answered the complaint by the due
date of February 17, 2009, Glatzer sought and obtained from
the Clerk of Court a Clerk's Certificate of Default, issued on
February 20, 2009.  By letter to the Court dated February 23,

-3-

2009, Defendants, represented by Anthony Tomari ("Tomari") of
the Office of the New York State Attorney General, requested
a conference to review a motion by Defendants to vacate the
default and to dismiss the action.  (See Letter to Hon. Victor
Marrero from Anthony J. Tomari, dated February 23, 2009 (the
"February 23 Letter."))  Tomari indicated that he and Glatzer
had spoken on February 12, 2009 and had agreed to continue
discussions before either side would take further action with
respect to the complaint.  Tomari's letter also expressed
three legal theories as grounds supporting dismissal of the
complaint: the Rooker-Feldman doctrine barring exercise of the
Court's subject matter jurisdiction over this action by reason
of certain prior state court proceedings Glatzer had litigated
in state courts; abstention under general principles of
comity, equity and federalism pursuant to Younger; and the
restriction in § 1983 prohibiting federal courts from issuing
injunctions against a judicial officer unless the judicial
officer has violated a declaratory judgment.  See Huminsky v.
Corsones, 396 F.3d 53, 74 (2d Cir. 2005).  By memo-endorsed
Order dated February 25, 2009 on the February 23 Letter, the
Court scheduled a conference for March 13, 2009 to address the
matters raised in Defendants' February 23 Letter.

Glatzer responded to Tomari's February 23 Letter by
letter to the Court dated February 25, 2009 in which he

-4-

presented his version of the conversations between him and
Tomari. (<u>See</u> Letter to Hon. Victor Marrero from Bernard H.
Glatzer, dated February 25, 2009 (the "February 25 Letter."))
He indicated that Tomari was confused about the applicable
time for filing Defendants' answer.  Tomari apparently thought
the deadline was thirty rather than twenty days from the
filing of proof of service, and undertook to communicate with
Glatzer again by February 19.  Because Glatzer did not hear
from Tomari on that date, he proceeded to request issuance of
a Clerk's Certificate of Default on February 20, 2009.
Glatzer again communicated with the Court by letter on March
9, 2009, where he opposed Defendants' motions to vacate the
Certificate of Default and to dismiss the complaint, and
sought leave to move for entry of a default judgment. (<u>See</u>
Letter to Hon. Victor Marrero from Bernard H. Glatzer, dated
March 9, 2009 (the "March 9 Letter.")) In that letter Glatzer
addressed Defendants' arguments in support of dismissal under
the authority of <u>Rooker-Feldman</u>, <u>Younger</u> and <u>Huminski</u>.
Specifically, he pointed to sections of his complaint in which
he had anticipated and responded at length to those
objections.

By memo-endorsed Order dated March 9, 2009 on Glatzer's
March 9 Letter, the Court rescheduled the March 13 conference
to March 20 and indicated that on the adjourned date it would

-5-

consider the matters raised by Glatzer's March 9 Letter and "hear argument" on Defendants' motion to dismiss. (Memo-Endorsed Order dated March 9, 2009.)

By letter dated March 13, 2009 Defendants responded to Glatzer's March 9 letter. (See Letter to Hon. Victor Marrero from Anthony J. Tomari, dated March 13, 2009 (the "March 13 Letter.")) They reiterated their view that the Rooker-Feldman and Younger doctrines compelled dismissal, and, as an additional argument, made reference to the Domestic Relations Exception to federal jurisdiction.[2]  See Elk Grove Unified Sch. Dist v. Newdow, 542 U.S. 1 (2004).

Finally, Glatzer wrote to the Court on March 15, 2009 acknowledging that the subjects to be addressed at the March 20 proceeding were Defendants' motions to vacate the Certificate of Default and to dismiss the complaint and Glatzer's motion for entry of judgment by default. (See Letter to Hon. Victor Marrero from Bernard H. Glatzer, dated March 15, 2009 (the "March 15 Letter.")) Glatzer further proposed that the Court also consider his application for a

---

[2]  At the proceeding the Court held on this matter on March 20, 2009, Glatzer asserted that he had not received Defendants' March 13 Letter, though Defendants replied that copies were sent to him by regular mail and fax.  Given Glatzer's denial of receipt, the Court does not consider the March 13 Letter in connection with its ruling on Defendants' motion. The Court notes, however, that the only new argument in that letter is the reference to the Domestic Relations Exception, which the Court would not need to address in any event in view of its finding of sufficient grounds to support the Court's decision in the issues the parties have adequately addressed.

preliminary injunction as stated in his complaint's prayer for relief.

Glatzer's March 15 Letter mentioned certain complications and actions taken by Defendants in the state court appellate proceedings allegedly stemming from uncertainties concerning the status of Defendants' default in the instant case. The Court responded by memo-endorsed Order dated March 16, 2009 on the March 15 Letter. It denied Glatzer's request for issuance of a default judgment and reiterated that the remaining matters would be addressed at the March 20, 2009 proceeding. The Court deemed entry of judgment by default unwarranted at that time for several reasons: Defendants' appearance in the action represented by Tomari; the discussions between Tomari and Glatzer prior to the date Defendants' answer was due; Tomari's apparent misunderstanding of the deadline for filing an answer, a circumstance that persuaded the Court that Defendants' failure to answer was not willful; and Defendants' proffer of what the Court considered meritorious defenses. See Pecarsky v. Galaxiworld.com, Ltd., 249 F.3d 167, 171 (2d Cir. 2001).

At the proceeding on March 20, 2009 the Court heard the parties' arguments on Defendants' motion to dismiss on the bases of the Rooker-Feldman and Younger doctrines. Glatzer challenged those theories as grounds for dismissal,

-7-

essentially for the reasons stated in his complaint as well as the March 9 and March 15 Letters. In particular, he argued that in a prior related action in this Court, Judge Kimba Wood had ruled that <u>Rooker-Feldman</u> did not apply to bar exercise of federal jurisdiction over Glatzer's § 1983 claims.

At the hearing the Court indicated that it would grant Defendants' motion.  In so doing, it considered the parties' arguments and their written submissions, including Glatzer's 37-page complaint, portions of which, the Court noted, would be more properly characterized as a memorandum of law, including extensive anticipatory legal argument regarding the <u>Rooker-Feldman</u> and <u>Younger</u> doctrines.  Accordingly, for the reasons stated below, on Defendants' motion to dismiss the complaint, as well as on the Court's own action, the Court dismisses Glatzer's complaint in this action.

## II.  <u>FACTS</u>

Glatzer alleges in his complaint that Barone is the Presiding Justice in an action Glatzer filed in New York State Supreme Court, Bronx County, entitled <u>Glatzer v. Bear, Stearns & Co., Inc.</u>, Index No. 21663-2004 (the "Bear Stearns Action"). He further asserts that Schachner is the Presiding Justice in an action Glatzer filed in New York State Supreme Court, Bronx County captioned <u>Glatzer v. Cardozo</u>, Index No. 21401-2005 (the "§ 1983 Action").  Glatzer's § 1983 Action had previously been

-8-

removed to this court but remanded by Judge Wood to the state court because of procedural defects, despite her finding, according to Glatzer, that the <u>Rooker-Feldman</u> doctrine was inapplicable to preclude federal jurisdiction over his § 1983 claims.  Regarding Lippman, Glatzer states that Lippman was named as a defendant in this case in his capacity as the Presiding Justice of the State Supreme Court, Appellate Division, First Department (the "Appellate Division")[3] "in the event Glatzer needs interim relief to effectuate Justice Barone's and Justice Schachner's compliance with this action's federal order." (Compl. ¶ 4.)

Glatzer alleges that in connection with the Bear Stearns Action, Barone entered an order of dismissal on January 23, 2008 in which he "refused to hear and adjudicate" eight-and-one-half of the nine causes of action Glatzer had asserted in the suit, as evidenced by the absence of any mention of those causes of action in the dismissal order.  (<u>Id.</u> ¶ 12.)  He claims that he has a fundamental due process right and a valid property interest under the Fourteenth Amendment to have all nine of his claims heard and adjudicated, and that Barone's refusal to adjudicate all of Glatzer's causes of action violated the Fourteenth Amendment in that the decision was

---

[3]  The Court notes that Lippman no longer serves in that capacity following his appointment by Governor David Paterson in February 2009 as Chief Judge of the New York State Court of Appeals.

arbitrary, capricious and irrational.  Glatzer further asserts
that Barone should have recused himself upon Glatzer's motion
alleging statutory conflict of interest under New York
Judiciary Law § 14 and 22 NYCRR §§ 100.2, 100.3, and 100.4
because of certain statements Barone made in open court
allegedly expressing an interest in joining the law firm
representing Bear Stearns in that litigation.  He states that
Barone improperly prevented Glatzer from taking a critical
deposition in the Bear Stearns Action by expediting his ruling
on the motion to dismiss so as to render the deposition moot.
Glatzer finally claims that Barone's dismissal was grounded
solely on erroneous reliance on and failure to adhere to
rulings by judges of this Court rendered in previous federal
suits by Glatzer arising from disputes related to the Bear
Stearns Action.

     With respect to Schachner, Glatzer alleges that Schachner
similarly refused to hear and adjudicate Glatzer's claims in
the § 1983 Action in which Glatzer had alleged collusion by
the defendants named in that case to deprive him of his
parental due process rights.  Schachner had issued an order of
dismissal of the § 1983 Action on March 24, 2008.  Glatzer
alleges that in so ruling Schachner based his decision upon
two "invalid excuses" grounded on the collateral estoppel
effect of certain judgments rendered by federal and state

courts. (Id. ¶ 52.)   Specifically, Glatzer states that Schachner refused to adhere to contrary orders issued by two judges of this Court on related actions Glatzer had filed here, and threatened "severe sanctions" if Glatzer brought those federal court orders to his attention. (Id.)   Glatzer alleges that Schachner's refusal to adhere to pertinent federal court orders constitutes a violation of the Supremacy Clause of the United States Constitution, violations for which he contends § 1983 provides an enforceable remedy through federal court injunction.

As relief for these alleged violations, Glatzer asserts that declaratory relief is not available to redress Defendants' past refusals to hear and adjudicate his claims in the Bear Stearns Action and the § 1983 Action.   Consequently, he argues that injunctive relief is the only effective remedy to compel Barone and Schachner to fully hear and adjudicate his actions, to adhere to federal court orders and to recuse themselves from those cases.

Anticipating Defendants' answer, Glatzer argues at length in his complaint that the Younger doctrine should not be invoked to justify abstention because no important state interest is implicated: (1) in the refusals by Barone and Schachner to hear and adjudicate Glatzer's claims; (2) in their not recusing themselves in view of the conflicts of

interest Glatzer alleges they labored under that affected their decisions; and (3) in their conspiring with the defendants in the underlying state court actions to cover up numerous alleged improprieties. Glatzer claims that adequate opportunity to appeal the dismissal orders does not exist in state courts because of extreme resentment against him by Barone and Schachner, and that exceptional circumstances present in this case support federal judicial intervention.

Glatzer appealed the dismissal orders issued by Barone and Schachner to the Appellate Division and moved for consolidation of the two appeals, as well as for an enlargement of time to fully inform the appellate court of the scope of the alleged constitutional violations Barone and Schachner had committed. Glatzer alleges that by Order dated November 6, 2008 the Appellate Division granted an enlargement of less than one month to perfect his appeals but that it "otherwise denied" the motion as to the constitutional matters. (Id. ¶ 104) (emphasis in original). Upon Glatzer's request for reconsideration, the Appellate Division on December 23, 2008 granted the motion "only to the extent" of further extending the time for appeal perfection. (Id.) (emphasis in original). Glatzer construes the conditional language in the granting of his reconsideration motion to indicate that the Appellate Division does not wish to hear,

and in fact "wishes to _ignore_" any of the constitutional
issues, challenges and claims presented in his appeals, as
well as the alleged constitutional violations and conflicts of
interest manifested in Barone's and Schachner's conduct.
(_Id._) (emphasis in original).   On this basis, Glatzer
concludes that no relevant state court appeal is available to
him in this case.

In his prayer for relief, Glatzer petitions the Court to
issue a permanent injunction: (1) directing Barone to hear and
adjudicate Glatzer's claims in the Bear Stearns Action and to
comply with applicable federal court orders, which Glatzer
states Barone could do by recusing himself from the case; (2)
directing Schachner to hear and adjudicate Glatzer's claims in
the § 1983 Action and to comply with applicable federal court
orders; and (3) staying Barone's and Schachner's dismissal
orders, including appeals of any relevant judgments, pending
this Court's ruling on Glatzer's request for a permanent
injunction.

Ordinarily, in reviewing a motion to dismiss, the Court
should first address grounds that challenge its subject matter
jurisdiction because, absent authority to adjudicate, the
Court lacks a legal basis to grant any relief, or even
consider the action any further.   See _Arar v. Ashcroft_, 532
F.3d 157, 168 (2d Cir. 2008) ("Determining the existence of

-13-

subject matter jurisdiction is a threshold inquiry and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it.") (internal citations and quotation marks omitted); <u>Can v. United States</u>, 14 F.3d 160, 162 n.1 (2d Cir. 1994) ("We appreciate that in most instances the question whether a court has subject-matter jurisdiction is, conventionally and properly, the first question a court is called on to consider."). Here, Defendants assert the absence of subject matter jurisdiction by application of the <u>Rooker-Feldman</u> doctrine. The Court does not rely on this ground by reason of substantial ambiguities it encountered in the leading Second Circuit case controlling the application of <u>Rooker-Fedlman</u> in this Circuit. Adequate alternative grounds warranting dismissal of this case exist under the <u>Younger</u> doctrine. However, for the reasons described below, the Court nonetheless discusses the <u>Rooker-Feldman</u> issues in the second part of this decision.

### III.  <u>DISCUSSION</u>

A.  <u>ABSTENTION</u>

In support of the extraordinary injunctive remedy he seeks, Glatzer repeatedly invokes the Supremacy Clause of the United States Constitution and the "superior authority of the

federal courts." (Compl. ¶ 68.)  Such an expansive view of federal jurisdiction as grounds for injunctive relief to intervene in pending state court proceedings would violate fundamental constitutional principles and statutory limitations on the federal courts' equitable powers.  As a starting point, longstanding federal statutory and case law, whose origins trace back to the Judiciary Act of 1793, have manifested a policy of imposing rigid constraints on federal court authority to issue injunctions to restrain the commencement or completion of state court proceedings.  See, e.g., 28 U.S.C. § 2283;[4] ("§ 2283"); 42 U.S.C. § 1983;[5] Younger, 401 U.S. at 43; see also Huffman v. Pursue, Ltd., 420 U.S. 592, 610 (1975); cf. Mitchum v. Foster, 407 U.S. 225, 243 (1972).

Though Glatzer correctly notes that in § 1983 Congress carved out an exception to the strict prohibition mandated by § 2283 against federal interference with state court proceedings by means of injunctive relief, the application of

---

[4]  28 U.S.C. § 2283 provides:

> A court of the United States may not grant an injunction to stay proceedings in a State Court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.

[5]  42 U.S.C. § 1983 provides:

> [I]n any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

that exception nonetheless remains circumscribed by the same basic principles that warranted the anti-injunction policy from its inception.  See Mitchum, 407 U.S. at 243 (holding that while § 1983 constitutes an exception to the anti-injunction statute, the Court did not "question or qualify in any way the principles of equity, comity, and federalism that must restrain a federal court when asked to enjoin a state court proceeding").

In Younger, the Supreme Court reviewed the extensive history, constitutional principles and precedents that reinforce the imperative that federal courts exercise utmost restraint when asked to enjoin state court functions.  It explained the reasons why its cases "repeat time and again that the normal thing to do when federal courts are asked to enjoin pending proceedings in state courts is not to issue such injunctions."  401 U.S. at 45.  In a much-quoted passage, the Younger Court elaborated that fundamentally this policy is grounded on

> the notion of "comity," that is, a proper respect for
> state functions, a recognition of the fact that the
> entire country is made up of a Union of separate state
> governments, and a continuance of the belief that the
> National Government will fare best if the States and
> their institutions are left free to perform their
> separate functions in their separate ways.  This ... is
> referred to by many as "Our Federalism"....  What the
> concept does represent is a system in which there is
> sensitivity to the legitimate interests of both State and
> National Governments, and in which the National
> Government, anxious though it may be to vindicate and

-16-

> protect federal rights and federal interests, always
> endeavors to do so in ways that will not unduly interfere
> with the legitimate activities of the States.

Id. at 44. Given the vital interests and principles at stake
when federal courts are called to intervene in state court
proceedings, Younger counsels that only a showing of bad
faith, harassment, or other unusual circumstance may justify
equitable relief.  See id. at 54.

In applying Younger, the Second Circuit has reaffirmed
that in recognition of the balance of state and national
interests the doctrine strives to achieve, "Younger generally
prohibits courts from 'taking jurisdiction over federal
constitutional claims that involve or call into question
ongoing state proceedings' so as to avoid unnecessary
friction."  Spargo v. New York State Comm'n on Judicial
Conduct, 351 F.3d 65, 75 (2d Cir. 2003) (quoting Diamond "D"
Constr. Corp. v. McGowan, 272 F.3d 191, 200 (2d Cir. 2002)).
The Spargo Court further counseled that "[g]iving states 'the
first opportunity ... to correct their own mistakes' when
there is an ongoing state proceeding serves the vital purpose
of 'reaffirm[ing] the competence of the state courts,' and
acknowledging the dignity of states as co-equal sovereigns in
our federal system." Id. (quoting Diamond "D" Constr., 282
F.3d at 200). Younger abstention is "mandatory," the Circuit
Court instructed, when "(1) there is a pending state

-17-

proceeding, (2) that implicates an important state interest, and (3) the state proceeding affords the federal plaintiff an adequate opportunity for judicial review of his or her federal constitutional claims." Id.

The Court finds that the prerequisites for application of Younger exist here. At the time Glatzer commenced this case, he was involved in state court proceedings he had filed in the Appellate Division that were still pending. That proceeding certainly implicated a vital interest of a state in correcting any errors of law or violations of state or professional codes of judicial conduct that may be committed by its judges. See Spargo, 351 F.3d at 75 (noting that "few interests can be considered more central than a state's interest in regulating its own judicial system"). And the state appellate proceedings, contrary to Glatzer's conclusory allegations, offer adequate opportunity for judicial review of his federal constitutional claims. In Huffman, the Supreme Court vacated a district court judgment granting injunctive relief in a § 1983 action which sought to bar enforcement of a state court judgment. The Supreme Court warned of the evils to our federal system, addressed by Younger, that federal judicial intervention prior to completion of state appellate proceedings would engender. See id., 420 U.S. at 608. The Court declared that a state's judicial system would not be

"fairly accorded the opportunity to resolve federal issues
arising in its courts if a federal district court were
permitted to substitute itself for the State's appellate
courts." Id. at 609. Accordingly, the Court held that the
"Younger standards must be met to justify federal intervention
in a state judicial proceeding as to which a losing litigant
has not exhausted his state appellate remedies." Id.

The Huffman Court rejected the losing party's assumption
that a state court appeal "was doomed to failure." Id. at 610.
The Court further declared that Younger's principles of comity
and federalism do not permit a losing party in a state court
to truncate the state proceeding and seek federal injunctive
relief because he "believes that his chances of success on
appeal are not auspicious." Id.  Pointing to the mandate of
Article VI of the United States Constitution, which declares
that the judges in every state shall be bound by federal law,
the Supreme Court refused to entertain "the assumption that
state judges will not be faithful to their constitutional
responsibilities." Id. at 611.  Similarly, in Pennzoil v.
Texaco, Inc., holding that the federal courts in that case
should have deferred under Younger to pending proceedings in
state court, the Supreme Court stated: "[W]e cannot say that
[state] courts ... would have been less inclined than a
federal court to address and decide the federal constitutional

-19-

claims." 481 U.S. 1, 17 (1987); see also Middlesex County Ethics Comm. v. Garden State Bar Ass'n, 457 U.S. 423, 431 (1982) ("Minimal respect for the state processes, of course, precludes any presumption that the state courts will not safeguard federal constitutional rights." (emphasis in original)).

By filing the instant action, Glatzer has essentially attempted to curtail or do an end run around ongoing state appellate proceedings. Assuming any validity to the circumstances Glatzer describes as unusual — Barone's and Schachner's alleged refusal to hear and adjudicate his claims, or to adhere to federal orders or recuse themselves, as well as other misdeeds — and even if he had some plausible ground for challenging the initial rulings of the Appellate Division, Glatzer makes no showing that any of the appellate decisions he describes were motivated by bad faith, harassment or other unusual circumstance sufficient to justify his failure to complete the proceedings and thus to warrant the equitable relief he seeks from this Court. Nor does he offer any reason why his constitutional rights could not be sufficiently protected through further appeal, if necessary, to the New York Court of Appeals, or ultimately through review by the United States Supreme Court. And in contradistinction to the affirmative interest and public duty of the state court system

to correct the legal errors and misconduct of its judges, Glatzer posits a self-directed negative interest: that "no important state interest is implicated" in the state judges' alleged violations of Glatzer's federal rights. (Compl. ¶¶ 89-93.) Glatzer simply presumes that judicial system would not adequately regulate its courts or safeguard his constitutional claims. The Supreme Court has made clear that the <u>Younger</u> doctrine precludes federal courts from entertaining any such assumption.

Specifically, Glatzer asks the Court to issue an injunction staying the execution of Barone's and Schachner's dismissal orders in the Bear Stearns and § 1983 Actions, so as to forestall any legal proceedings to carry out the state courts' judgments, including any appeals of them during the pendency of his federal litigation. He also requests the Court to direct the state judges to act affirmatively to hear and adjudicate substantive claims they have already considered and dismissed, or else to recuse themselves from the particular cases for alleged conflicts of interest. On the basis of Glatzer's conclusory presumption that the Appellate Division "does not wish to hear," and indeed "wishes to <u>ignore</u>" all of the constitutional issues and claims he raises, Glatzer urges this Court halt further state appeal proceedings, wrest jurisdiction from the state appellate

courts and effectively invest itself with authority to supplant a legitimate function of the state courts. (Compl. ¶ 106) (emphasis in original).

Even more extreme, and presenting clearer evidence of the affront to comity and federalism that Glatzer's robust notion of federal supremacy would countenance, is the purpose for which Glatzer has hauled Lippman into this Court. The complaint contains no mention of any personal involvement by Lippman in any of the injuries for which Glatzer seeks injunctive relief against him. Rather, Glatzer asserts that Lippman was named as a defendant in his capacity as the Presiding Justice of the Appellate Division, "in the event that Glatzer needs interim relief to effectuate Justice Barone's and Justice Schachner's compliance with this action's federal order." (Id. ¶ 4.) Bluntly put, though he states no substantive claim against Lippman arising from the alleged improper dismissal orders and wrongful conduct of Barone and Schachner, Glatzer nonetheless asks this Court to keep the Presiding Justice of the Appellate Division in reserve within the bounds of federal authority in this litigation, in effect holding him hostage in the back benches of the proceeding for the duration of the case, simply to have him available if needed to serve as this Court's federal compliance officer. Such an excessive notion of judicial power is incompatible

with federal expression of "a decent respect" for the state courts' functions.

Under the facts presented here Glatzer's quarrel with the way Barone and Schachner and the Appellate Division handled his litigation falls far short of the egregious state court errors, acts or omissions amounting to constitutional violations that may justify federal court intervention. See Younger, 401 U.S. at 46; see also Huffman; 420 U.S. at 611; Fenner v. Boykin, 271 U.S. 240 (1926). Even accepting all of Glatzer's allegations as true for the purposes of this motion, the Court finds nothing in the circumstances he describes that rises to the level of the extremely rare and extraordinary circumstances that the Supreme Court has held would present a sufficiently grave, immediate and irreparable danger to constitutional protections as to warrant federal judicial intervention to bar a state from carrying out the proper administration of its justice system. See Dombrowski v. Pfister, 380 U.S. 479, 484-85 (1965); Ex parte Young, 209 U.S. 123 (1908); see also Baggett v. Bullitt, 377 U.S. 360 (1964); Thornhill v. Alabama, 310 U.S. 88 (1940). To warrant such a drastic remedy, these cases explicitly and quite purposefully hold, the bar must be set exceptionally high. Under this standard injuries such as the cost, anxiety, and inconvenience associated with defending against a state criminal prosecution

or appealing a civil lawsuit in state courts, without more, cannot be considered "irreparable" so as to satisfy the rigorous test. See Dombrowski, 380 U.S. at 484-85 ("[T]he mere possibility of erroneous initial application of constitutional standards will usually not amount to the irreparable injury necessary to justify a disruption of orderly state proceedings."); see also Huffman, 420 U.S. at 611; Younger, 401 U.S. at 46.

Nothing could more offend the concepts of comity and federalism so embedded in the dual structure of our national government, or show contempt for the dignity of the states, than a display of federal arrogance in sovereign disregard of a state's administration of justice. The structural supremacy that the federal Constitution confers on the national government as a necessary prerogative does not give warrant to engender a master/servant relationship between  federal and state authorities. In the judicial domain, the delicate balance of functions essential to preserve complementary federal and state justice systems would be gravely disrupted if the federal judiciary were empowered to hurl injunctive bolts or crack the whip at will to keep state judges in line, in essence commanding them to "do your job, or else." Yet, the remedy Glatzer seeks would demand that this Court promulgate  precisely such drastic orders.

-24-

Courts are accustomed to the untutored and inarticulate claims, outlandish theories and breathless venting that not uncommonly swell the pleadings of pro se litigants.  In those circumstances, the courts are obliged to make proper allowances for  the lack of legal training and experience that ordinarily excuse a pro se party's performance in litigation. This Court, however, even at the risk of overkill, cannot so lightly or solicitously dismiss Glatzer's extraordinary application.  Glatzer invokes a grandiose view of the Supremacy Clause, and seeks a broad injunction to compel state trial judges to do a better job in adjudicating his claims and to stay enforcement of the state court judgments and any related state appellate proceedings.  But Glatzer is no ordinary pro se plaintiff, and his sweeping claims for injunctive relief cannot be ascribed to ignorance of the law.

As noted above, Glatzer describes himself as an inactive member of the Texas bar.  He has been engaged in numerous federal and state court litigations relating to the Bear Stearns and § 1983 Actions since about 1995.  As proof that he is no novice in the courthouse, but a formidable foe and a force to be reckoned with, Glatzer charges that Barone and Schachner are resentful of him because "Glatzer has been cited approvingly in the Wall Street Journal ... and in the New York Times ... as the <u>first</u> person in the United States who

-25-

reported and challenged Enron's ... misconduct." (Compl. ¶ 94.)  He also boasts in his lengthy complaint, which doubles as a legal brief, that he, "pro se, set a record by winning twice in the Second Circuit Court of Appeals on the same day of oral argument ... which was featured on the front page of the New York Law Journal .... Glatzer defeated in the Second Circuit two thousand-person law firms, including New York's preeminent bankruptcy firm, without paying any fee to a comparable New York law firm." (Id. ¶ 93.)  Moreover, at the March 20, 2009 oral argument before this Court, Glatzer used the occasion to remind the Court of his successful record on appeal at the Second Circuit.  The Court therefore feels obliged to accord Glatzer's legal arguments and substantive claims consideration equal to the seriousness with which he advocates them.

Because the concept of federal judicial supremacy Glatzer presents here is advanced by the earnest advocacy of a skilled practitioner, and not by the fanciful or incoherent ramblings of a neophyte, and because Glatzer's legal theories embody profound constitutional implications, his arguments merit considered attention and equally emphatic rejection.  Having performed its duty of conducting a sober review of Glatzer's complaint, the Court concludes that it cannot grant the injunctive relief Glatzer seeks, and that the more prudent

-26-

course for the Court is to abstain from adjudicating this action in deference to the pending state appellate proceedings.

B.   ROOKER-FELDMAN DOCTRINE

Though the Court has found adequate grounds that warrant dismissal of Glatzer's complaint and thus need not address Defendants' Rooker-Feldman argument, it does so to call attention to an ambiguity the Court encountered in applying the Second Circuit's leading Rooker-Feldman decision.  As the analysis laid out below suggests, even if three of the four requirements the Circuit Court has enunciated as the test for application of Rooker-Feldman were satisfied here, the Court would not be able to proceed because of some uncertainty concerning the proper characterization of the fourth element. Under the analysis set forth below, that ambiguity could determine the outcome.

Defendants, invoking the Rooker-Feldman doctrine, assert that the Court lacks subject matter jurisdiction over this action insofar as Glatzer asks the Court to reverse or modify state court judgments at issue here.  See Rooker, 263 U.S. at 416; Feldman, 460 U.S. at 482; Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 284 (2005); Hoblock v. Albany County Bd. of Elections, 422 F.3d 77, 85 (2d Cir. 2005).  They contend that the doctrine bars actions "brought

-27-

by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." Exxon Mobil, 544 U.S. at 284.

Glatzer responds that the Rooker-Feldman doctrine does not bar federal jurisdiction to relitigate a matter previously raised in state court as long as the federal plaintiff "'present[s] some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party.'" Id. at 293 (citations omitted). Glatzer also asserts that in connection with the attempted removal of the § 1983 Action to federal court, Judge Wood held in an Order dated September 26, 2007 (the "September 2007 Order") that "the Rooker-Feldman doctrine is inapplicable to Glatzer's Sect. 1983 claim." (Compl. ¶ 3.)

At the outset, the Court notes that Glatzer misrepresents the substance of Judge Wood's September 2007 Order upon which he relies.  The precise text of Judge Wood's order reads: "[Glatzer's] objection to removal based on the Rooker-Feldman doctrine lacks merit.  However, it is not necessary to address this argument because removal is appropriate on the grounds of procedural defect."  Order, Glatzer v. Cardozo, No. 05 Civ. 10113 (S.D.N.Y. Sept. 26, 2007), slip. op., at 5 n.1.  Thus, not only did Judge Wood not hold, as Glatzer states, that the

-28-

Rooker-Feldman to doctrine does not apply to Glatzer's § 1983 claim then before the court, what Judge Wood expressly declared was that Glatzer's Rooker-Feldman objection as a ground to oppose removal of the action to federal court had no merit.

The Rooker-Feldman doctrine holds that federal courts lack subject matter jurisdiction over federal actions that essentially amount to appeals from state court judgments to the extent the federal suit seeks to obtain direct review of a judgment rendered by a state court, or to resolve "federal constitutional claims ... [that] are 'inextricably intertwined' with the challenged state court judgment." Hoblock, 422 F.3d at 86 (quoting Feldman, 460 U.S. at 483-84 n.16). In Exxon Mobil, the Supreme Court noted that in the years since its decisions in Rooker and Feldman lower federal courts had incorrectly read the doctrine "to extend far beyond the contours of the Rooker and Feldman cases, overriding Congress' conferral of federal-court jurisdiction concurrent with jurisdiction exercised by state courts, and superceding the ordinary application of preclusion law." 544 U.S. at 283.

In light of Exxon Mobil, the Second Circuit reformulated its reading of the Rooker-Feldman doctrine. In Hoblock, the Circuit Court declared that the phrase "inextricably intertwined," as it derived from Feldman, "has no independent

-29-

content" and had led lower federal courts, including the
Second Circuit, to apply <u>Rooker-Feldman</u> too broadly. 422 F.3d
at 86-87.  To guide the application of <u>Rooker-Feldman</u> as
clarified by <u>Exxon Mobil</u>, the Circuit Court  identified four
requirements, two which it characterized as procedural and two
as substantive.  Procedurally, the plaintiff in the federal
action (1) must have been the losing party in the prior state
court proceeding, and (2) the state court judgment "must have
been 'rendered before the district court proceedings
commenced'". <u>See</u> <u>id.</u> at 85;[6] <u>see</u> <u>also</u> <u>McKithen v. Brown</u>, 481
F.3d 89, 97 (2d Cir. 2007) (stating the two procedural
requirements consistent with this formulation in <u>Hoblock</u>).
Substantively, the federal plaintiff (1) "must complain of
injury from a state-court judgment" and (2) "seek federal-
court review and rejection of the state-court judgment."
<u>Hoblock</u>, 422 F. 3d at 85.

    The <u>Hoblock</u> Court elaborated several principles that
inform the Court's analysis of the <u>Rooker-Feldman</u> requirements
and thus control the adjudication of the issue presented by
the instant case: (1) <u>Rooker-Feldman</u> and preclusion rules "are
entirely separate doctrines," thus recognizing that <u>Exxon
Mobil</u> abrogated prior case law which had held that the two

[6] Although the Circuit Court's opinion does not include a citation for the
language quoted in this sentence, the text derives from <u>Exxon Mobil</u>, 544
U.S. at 284.  <u>See</u> discussion below at text accompanying n.7.

principles were coextensive, id.; (2) "a plaintiff who seeks
in federal court a result opposed to the one he achieved in
state court does not, for that reason alone, run afoul of
Rooker-Feldman," id. at 87; (3) presenting in federal court a
legal theory not raised in state court does not save a
plaintiff from application of Rooker-Feldman "if the federal
suit nonetheless complains of injury from a state-court
judgment and seeks that judgment reversed," id. at 86; and (4)
a federal suit complains of injury from a state court
judgment, and thus Rooker-Feldman would bar exercise of
federal jurisdiction, when the injury the plaintiff complains
about in the federal action is "caused by" or "produced by"
the prior state court judgment. Id. at 87.

    1.   The Substantive Requirements

Glatzer's complaint asserts that he appealed Barone's and
Schachner's dismissal orders resolving the Bear Stearns and §
1983 Actions to the Appellate Division and that in two
separate orders responding to his motion for an enlargement of
time to appeal, in which he had fully detailed his
constitutional challenges and claims, the Appellate Division
effectively indicated that it would not hear those federal
questions. If Glatzer's characterization of the Appellate
Division's rulings is correct, his federal suit at bottom
represents a challenge to the Appellate Division's decision

insofar as it embodies the dismissal orders of Barone and Schachner. The analysis that follows assumes, but, for reasons described in the section below addressing the procedural requirements, does not decide, that Glatzer's description of the Appellate Division's orders is accurate. On that basis, as also further dismissed below, the Court could find that the Appellate Division's orders — if in fact they resolved all the federal questions at issue — constituted a final judgment. In that event the Rooker-Feldman substantive requirements would be satisfied.

In essence, Glatzer complains of an injury from violations of constitutional rights that derives from the state court judgment which dismissed his actions and declined to hear his federal challenge. To redress that injury he seeks federal court review and rejection of that judgment. The requisite causal connection between the state court judgment and the source of the injury Glatzer asserts in his subsequent federal claims may be satisfied under two circumstances that emerge from the facts in Hoblock and the Second Circuit's reading of Exxon Mobil: (1) where, as in Feldman, the state court judgment itself rather than some action by the defendant in the prior state court litigation is the source or cause of the injury the federal plaintiff

complains about in the federal suit,[7] or (2) where, as in Hoblock, the underlying harmful action the federal plaintiff complains about was actually taken by a third party in compliance with an order embodied in a judgment rendered by a state court.[8] Further explaining these rules, the Second Circuit stated in McKithen that the applicability of Rooker-Feldman turns not on the similarity between a party's state and federal claims, "but rather on the causal relationship between the state-court judgment and the injury of which the party complains in federal court."  481 F.3d at 98 (emphasis in original).  Moreover, the Circuit Court declared that a party does not complain of an injury "caused by" a state court judgment "when the exact injury of which the party complains

_____

[7]   In Exxon Mobil, the Supreme Court declared that Rooker-Feldman was confined to cases "of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments."  544 U.S. at 284 (emphasis added).  In Feldman the injury plaintiffs complained of in the federal suit was "caused" directly by a state court judgment insofar as the underlying dispute entailed a denial by the District of Columbia Court of Appeals of plaintiffs' applications for admission to the bar, a process ordinarily administered and determined directly by state courts in many jurisdictions.  The subsequent suit in federal courts thus challenged and sought reversal of the judgment of a state court that it claimed as the cause of the injury, not an action taken by some other defendant or third party in a prior state litigation.

[8]   For instance, in Hoblock, plaintiffs' federal suit challenged a county Board of Election's refusal to tally certain disputed ballots.  In deciding not to count the ballots, the Board had complied with the judgment of the state court in a prior action brought by some of the same voters.  The Circuit Court found that Rooker-Feldman applied because the Board had acted "under compulsion of a state-court order," 422 F.3d at 88, and therefore "the state-court judgment produced the Board's refusal to count the ballots, the very injury of which the voters complain," id. at 89.

in federal court existed <u>prior</u> in time to the state-court
proceedings." <u>Id.</u> (emphasis in original).

The central inquiry that emerges from these principles,
the Second Circuit stressed, is rooted in the requirement that
"federal plaintiffs are not subject to the <u>Rooker-Feldman</u> bar
unless they <u>complain of an injury</u> caused by a state judgment."
<u>Hoblock</u>, 422 F.3d at 87 (emphasis in original). In its
elaboration of this standard, the Circuit Court observed:

> a federal suit complains of injury from a state-court
> judgment, even if it appears to complain only of a third
> party's actions, when the third party's actions are
> produced by a state-court judgment and not simply
> ratified, acquiesced in, or left unpunished by it. Where
> a state-court judgment causes the challenged third-party
> action, any challenge to that third-party action is
> necessarily the kind of challenge to the state judgment
> that only the Supreme Court can hear.

<u>Id.</u> at 88.[9]

---

[9]   To illustrate the application of these principles, the <u>Hoblock</u> Court
offered two examples.  In the first, where <u>Rooker-Feldman</u> would bar the
federal suit, the Court posited a judgment by a state court terminating a
father's parental rights and ordering state custody of the child.  A
subsequent action by the father in federal court alleging violation of due
process rights and demanding the return of his son would be considered
complaining of an "injury caused by the state judgment and seeking its
reversal."  422 F.3d at 87.  Such a suit would run afoul of <u>Rooker-
Feldman</u>, "<u>regardless of whether</u> [<u>the plaintiff</u>] <u>raised any constitutional
claims in state court</u>, because only the Supreme Court may hear appeals
from state-court judgments."  <u>Id.</u>  (emphasis added).  In the second
illustration, a federal suit to which <u>Rooker-Feldman</u> would not apply, an
employee loses a state court action charging discrimination under both
federal and state law and then brings the same case in federal court.
Though he would be seeking a federal court decision denying the state
court's determination that the employer was not liable, the action would
be alleging injury causally brought about not by some action of the state
court as embodied in its judgment, but by the employer's discrimination.
Thus, the suit would not be barred by <u>Rooker-Feldman</u> even though the state
court chose not to remedy the alleged injury.  <u>See id.</u> at 87-88.  In that
event, the federal court in a subsequent suit seeking to relitigate the
plaintiffs' claims would determine to what extent the plaintiff's federal
action would be barred by application of state law issue and claim

Under the Hoblock analysis, insofar as Glatzer's federal litigation ultimately seeks to deny and reverse the Appellate Division's orders declining to hear Glatzer's federal challenge to the dismissal of the Bear Stearns and § 1983 Actions, his federal suit would be barred by lack of jurisdiction under Rooker-Feldman if the "source of the injury" he complains about derives causally from alleged adverse actions taken by the state courts, as reflected in the Appellate Division's judgment. However, Rooker-Feldman would not apply if the injury Glatzer claims in the federal suit stems collaterally from some adverse state court adjudication relating to the claim of wrongful conduct by the defendants that Glatzer alleged in the original state court litigation.

Glatzer argues that his action in this Court raises some independent claim beyond the contours of Rooker-Feldman, essentially because it seeks to litigate matters here that were not adjudicated by the state courts. As Hoblock makes clear, however, that Glatzer did not raise or adjudicate before the state trial courts or the Appellate Division the issues and claims he asserts in the instant case, and therefore that the state courts never passed on the merits of these matters, does not preclude application of Rooker-Feldman. See 422 F.3d at 86 (noting that if a federal suit

---

preclusion rules. See id. at 88 n.6.

complains of an injury from a state court judgment and seeks to reverse it "[j]ust presenting in federal court a legal theory not raised in state court ... cannot insulate a federal plaintiff's suit from Rooker-Feldman").

Moreover, Glatzer suggests that as regards other matters, his federal action merely represents relitigation of claims and issues adjudicated in the state proceedings. In this action Glatzer did not name as defendants the parties sued in the state proceedings, or assert any of the specific claims for relief that were at issue before the state courts. Consequently, this litigation does not present a case in which the state court's judgment merely "ratified, acquiesced in, or left unpunished" some action of defendants or third-parties in the original state court proceedings. Id. at 88 ("The fact that the state court chose not to remedy the injury [allegedly caused by defendants in the original state court litigation] does not transform the subsequent federal suit on the same matter into an appeal, forbidden by Rooker-Feldman, of the state-court judgment.").

At bottom, the injuries Glatzer complains about before this Court arise from certain acts and omissions of Barone and Schachner that occurred in connection with the performance of their judicial duties. Specifically, Glatzer claims violations of his constitutional rights by reason of judicial

errors and ethical conflicts, under both state and federal
law, manifested by the judges' failure to fully hear and
adjudicate the claims he asserted in the Bear Stearns and
§ 1983 Actions.  Thus, the state court decisions encompassing
Barone's and Schachner's dismissal orders, as embodied in the
Appellate Division's orders declining to hear his appeals,
constitute the actual wrongful action at issue, the state
judgment that allegedly "caused" or "produced" the various
constitutional injuries for which Glatzer demands relief in
this Court.

Because the remedy Glatzer seeks to redress the injuries
he alleges would fundamentally require the Court to review and
reject the state judgment in question, the second of the
Hoblock substantive elements would be satisfied. See Hoblock,
422 F.3d at 86; see also Lance, 546 U.S. at 466 (declaring
that Rooker-Feldman applies "where a party in effect seeks to
take an appeal of an unfavorable state-court decision to a
lower federal court"); Johnson v. De Grandy, 512 U.S. 997,
1005-06 (1994) (declaring that the Rooker-Feldman doctrine
bars a losing party in state court litigation "from seeking
what in substance would be appellate review of the state
judgment in a United States district court, based on the
losing party's claim that the state judgment itself violates
the loser's federal rights"). Insofar as Glatzer's federal

action is tantamount to an appeal from a state court judgment, under Hoblock's substantive requirements this case would thus "run afoul of Rooker-Feldman" because "only the Supreme Court may hear appeals from state-court judgments." 422 F.3d at 87.

2.   The Procedural Requirements

The Court next addresses the two Rooker-Feldman "procedural" requirements enunciated in Hoblock.  On this point the Court finds substantial ambiguity in Hoblock.  In its initial articulation of the four Rooker-Feldman requirements, the Circuit Court identified the two procedural elements as: (1) "the federal-court plaintiff must have lost in state court," and (2) "the state-court judgment must have been 'rendered before the district court proceedings commenced' - i.e., Rooker-Feldman has no application to federal-court suits proceeding in parallel with ongoing state-court litigation." 422 F.3d at 85.

Whether Glatzer "lost" in state court, and whether the state court judgment was rendered before Glatzer's federal action commenced, depends upon two questions: what constitutes the state court "judgment," and is the judgment final or interlocutory?  Here, the dismissal orders issued by Barone on January 23, 2008 and by Schachner on March 24, 2008, reflected adverse decisions that disposed of the Bear Stearns and § 1983 Actions, and by which Glatzer thus "lost" in those state

-38-

proceedings.   Glatzer appealed both dismissal orders to the Appellate Division and that court issued the rulings pertinent to this action on November 6, 2008 and December 23, 2008. Glatzer contends that because the sole issues presented in his appeals were his constitutional challenges, the Appellate Division's decisions indicate a determination by that court to ignore his federal law claims.   On this theory, the state court decision relevant for this inquiry would be the judgment of the Appellate Division on Glatzer's appeals of the trial courts' dismissal orders.

If Glatzer's characterization of those appellate orders is accurate, Glatzer "lost" his litigation in the state court proceedings as of December 23, 2008.  He commenced the instant federal action on January 22, 2009.  However, at that time, and even as of March 2009, according to the parties' communications with this Court, the state appellate proceedings were still pending.   This analysis raises the question of whether the Appellate Division orders represent interlocutory decisions or final judgments at the time they were rendered and thus whether the state proceedings thereby "ended" for Rooker-Feldman purposes, at least in respect of Glatzer's federal claims.

With regard to the timing issue encompassed by the Rooker-Feldman procedural requirements, Exxon Mobil instructs

-39-

that the doctrine applies to cases in which the losing party in state court files a federal action "after the state proceedings ended."  544 U.S. at 291.  Ordinarily, judicial proceedings have "ended" when a "final judgment" has been entered.  In most cases that point is reached at two stages in the litigation: when neither party seeks further review of a court's decision and the time for appeal expires, or when a lower court's decision is appealed and affirmed by the highest court in which review is available.  See 28 U.S.C. § 1257; Gentner v. Shulman, 55 F.3d 87, 89 (2d Cir. 1995).  For Rooker-Feldman purposes, however, Exxon Mobil suggests a third situation: state proceedings which have ended when all federal questions at issue have been adjudicated, though the litigation may remain open for resolution of pending state law disputes or other factual matters.  In that event, a state court interlocutory order resolving the federal issues in dispute may be deemed a final judgment sufficient to support a finding that the state proceedings have "ended."  See, e.g., Federación de Maestros de P.R. v. Junta de Relaciones del Trabajo de P.R., 410 F.3d 17, 25 (1st Cir. 2005).

In Hoblock, the Second Circuit made reference to this question.  It acknowledged that "federal suits challenging interlocutory state judgments may present difficult questions as to whether 'the state proceedings have "ended" within the

meaning of <u>Rooker-Feldman</u> on the federal questions at issue.'"
422 F.3d at 89 (<u>quoting</u> <u>Federación de Maestros</u>, 410 F.3d at
17).  Noting that commonly the federal litigation comes "after
the state suit has unequivocally terminated," as was the case
in <u>Hoblock</u>, the Circuit Court did not address the issue any
further.  <u>Id.</u>

As the record stands in the instant case, at the time
Glatzer commenced his federal action, the state Appellate
Division proceedings were still pending, and no final decision
had been rendered in connection with Glatzer's entire appeals.
To this extent, the state proceedings had not "ended," and
Glatzer's subsequent federal court case would represent
parallel litigation.  However, Glatzer contends that the
Appellate Division's November 6, 2008 order, while granting
him an extension to perfect an appeal, "<u>otherwise denied</u>" his
motion as to the federal questions at issue.  (Compl. ¶ 104)
(emphasis in original).  Similarly, he argues that the
Appellate Division's subsequent order on December 23, 2008
granted reconsideration but "<u>only to the extent</u>" of further
enlarging his time for appeal.  (<u>Id.</u> ¶ 106) (emphasis in
original.)  Glatzer construes those orders essentially as
manifesting a decision by the Appellate Division not to hear
any of his federal challenges and claims.  (<u>Id.</u>) On the
premise that according to what he regards as the extraordinary

circumstances present here any further state court appeal did not exist, presumably because it would have been futile given the resentment against him created by Barone and Schachner, Glatzer did not seek review of the Appellate Division's orders by the state's highest court. Again for the sake of this argument, the Court indulges Glatzer's contention. On this theory, the Appellate Division's orders, insofar as they resolved all the federal questions at issue as of December 23, 2008, would constitute a final judgment that "ended" the state proceedings. In consequence, if the Court were to decide this issue in accordance with Glatzer's interpretation, because Glatzer's federal suit commenced after the state proceedings had ended, <u>Rooker-Feldman</u>'s second procedural requirement would be satisfied.

The Court of course is not obligated to accept Glatzer's legal conclusion characterizing the Appellate Division's cryptic procedural orders enlarging Glatzer's time for appeal as also embodying a final resolution of the procedural federal questions at issue. Though the Court does not decide this issue, even if it were to conclude that the Appellate Division's judgment was final and thus ended the state proceedings as regards Glatzer's federal claims and challenges, the Court would not be able to proceed with the <u>Rooker-Feldman</u> analysis on account of a further ambiguity it

-42-

encountered in another aspect of Hoblock.

In the later portion of the Hoblock opinion elaborating on the two Rooker-Feldman procedural requirements, the Circuit Court describes them as "1) the federal suit must follow the state judgment; and 2) the parties in the state and federal suits must be the same." 422 F.3d at 89 (citing Exxon Mobil, 125 S. Ct. at 1521-22). This statement of the second procedural requirement, which the Hoblock Court characterizes as "imposed" by Exxon Mobil, differs substantially from its initial description earlier in the opinion. See id. at 85 (quoting Exxon Mobil and specifying that the second procedural requirement demands that the state court judgment must have been "rendered before the district court proceedings commenced").[10]

The source and implications of this change are unclear. Though the Circuit Court states that the requirement is "imposed" by Exxon Mobil, the pages of the Exxon Mobil opinion to which it cites (125 S. Ct. at 1521-22) contain no mention of a requirement that "the parties in the state and federal suits must be the same" as one of the prerequisites for application of Rooker-Feldman. See Exxon Mobil, 544 U.S. at

---

[10]  Cf. McKithen, 481 F.3d at 97 & 98 n.8 (quoting Hoblock in stating that the second Rooker-Feldman procedural prong renders the doctrine inapplicable unless the relevant "'state-court judgment [was] rendered before the district court proceeding commenced.'"). See discussion above at text accompanying n.7.

284; see also Lomnicki v. Cardinal McCloskey Servs., No. 04
Civ. 4548, 2007 WL 2176059, at *4 n.7 (S.D.N.Y. July 26, 2007)
(noting that "[c]omplete identity of all parties does not
appear necessary"); Bush v. Danziger, No. 06 Civ. 5529, 2006
WL 3019572, at *4 n.3 (S.D.N.Y. Oct. 23, 2006) (noting that
the Supreme Court "has not held that there must be complete
identity of plaintiffs or parties in the two proceedings");
see also Bernstein v. State of New York, No. 06 Civ. 5681,
2007 WL 438169, at *5 (S.D.N.Y. Feb. 9, 2007).  What the pages
from Exxon Mobil cited by the Circuit Court do express is the
formulation of the second procedural requirement initially
specified in the Hoblock opinion, namely that the state court
judgment must be "rendered before the district court
proceedings commenced."  See Exxon Mobil, 544 U.S. at 284;
Hoblock, 422 F.3d at 85.

     If the Hoblock Court in fact altered the second
requirement, or added a new element demanding that "the
parties" to the state and federal proceedings must be the
same, it leaves unexplained not only the origin but rationale
for the change.  A requirement of identity of all parties in
both proceedings invites questions as to the legal reason why
the state court defendant would always need to be named in the
subsequent federal action.  This question arises particularly
in a case such as Glatzer's, where the state court defendant

-44-

is really not a necessary party in the federal suit because the injury the federal plaintiff complains about is not "caused" by that defendant but rather by the wrongful conduct of another actor that is manifested by the state court judgment.  It is the latter injury that the federal plaintiff seeks to remedy by challenging and seeking to reverse the state judgment.  A rule requiring exact identity of parties, moreover, would enable the losing state court litigant to avoid the application of Rooker-Feldman in the subsequent federal proceedings simply by means of "clever pleading," such as adding or subtracting a plaintiff or a defendant, purposely for tactical reasons. See Lomnicki, 2007 WL 2176059, at *4 n.7; Bush, 2006 WL 3019572, at *4 n.3.[11]

Thus, since the applicability of Rooker-Feldman is determined by the injury complained about and the judgment challenged and sought to be reversed in the federal suit, the identity of litigants that should matter for Rooker-Feldman purposes is that involving the plaintiff in the federal proceeding as the losing party in the state court litigation.  However, to compound the confusion, in a passage later on the same page where the Hoblock Court describes the second

---

[11] Elsewhere in the Hoblock opinion, in discussing an example of the substantive requirement that the injury the plaintiff complains about must be caused by a state court judgment rather than by an individual, the Circuit Court expressed concern over the prospect of a plaintiff avoiding Rooker-Feldman "simply by clever pleading."  422 F.3d at 88.

requirement as demanding that "the parties" be the same in both state and federal suits, it proceeds to describe the second requirement as "common identity between the state and federal plaintiffs."  422 F.3d at 89 (emphasis added).  (In fact, one of the disputes at issue in Hoblock involved precisely the question of whether legally sufficient common identity or privity existed between the plaintiffs in the state and federal proceedings.)  Most recently, by a Summary Order rendered in Rotering v. Amodeo, the Second Circuit once again articulated the four Rooker-Feldman requirements as originally stated in Hoblock.  See No. 07-4357-cv., 2009 WL 579138 (2d Cir. Mar. 6, 2009) (citing McKithen, 481 F.3d at 97) (citing Hoblock, 422 F.3d at 85)).  But the Court then explained that "the procedural requirements imposed by Exxon Mobil Corp. mean: (a) the federal suit must follow the state judgment; and (b) there must exist a common identity between the party defeated in a state court and the federal plaintiff." Id. at *1 (citing Hoblock, 422 F.3d at 89).

For this Court, the upshot of the various ambiguities that emerge from Hoblock's formulation of the second Rooker-Feldman procedural requirement is that the Court is unable to apply the doctrine to the facts presented.  In his federal suit Glatzer did not name the defendants in the state litigations because here he is claiming injuries caused not by

-46-

those defendants, but by the judgment of the state courts whose orders he challenges.  Thus, because he instead elected to bring the federal suit against the state judges directly, in this action there is no common identity between "the parties" in the state and federal proceedings, and Hoblock's later formulation of Rooker-Feldman's second procedural requirement, whether in error or as an additional element, would not be satisfied.  This result follows even if the Court found that the requirement as first characterized – that the state court judgment was rendered before the federal proceeding commenced – had been met.

Thus, as parsed above, this case presents an instance in which this uncertainly may be decisive to a determination as to whether or not Rooker-Feldman applies. Even though the substantive requirements are satisfied, the determination concerning the existence of the Court's subject matter jurisdiction would depend upon which of the Hoblock statements of the second procedural requirement the Court applies, or else upon the meaning of the Circuit Court's identity of parties language.  While other courts have chosen to overlook or explain the discrepancy as not necessary for the application of Rooker-Feldman to the particular cases before them, in view of the Hoblock Court's repeated and explicit references to the second requirement as reformulated in the

-47-

latter part of the opinion, this Court views it more appropriate to call attention to the issue rather than ignore or attempt to reconcile the difference. See Lomnicki, 2007 WL 2176059, at *4 n.7; Bernstein, 2007 WL 438169, at *5; Bush, 2006 WL 3019572, at *4 n.3. Accordingly, the Court leaves this issue for another day to be clarified by the Second Circuit.

## ORDER

For the reasons stated above it is hereby

**ORDERED** that the motion of defendants Hon. John A. Barone, Hon. Larry S. Schachner and Hon. Jonathan Lippman (Docket No. 6) to dismiss the complaint of plaintiff Bernard H. Glatzer herein is GRANTED, and that alternatively the complaint is dismissed on the Court's action.

The Clerk of Court is directed to withdraw any pending motions and to close this case.

**SO ORDERED.**

Dated:    New York, New York
          30 April 2009

                                        VICTOR MARRERO
                                        U.S.D.J.

-48-

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5-1-09